COMMONWEALTH *vs.* DANA A. DAGGETT.

Plymouth. May 6, 1993. - November 8, 1993.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Deoxyribonucleic Acid. Homicide. Evidence*, Scientific test, Competency, Other offense. *Error*, Harmless. *Search and Seizure*, Consent. *Practice, Criminal*, Argument by prosecutor.

At a murder trial, any error in the admission of evidence of tests performed on the victim's deoxyribonucleic acid (DNA) and on DNA extracted from blood found in the trunk of the defendant's automobile and at the defendant's workplace was harmless where this evidence was merely cumulative of other overwhelming evidence linking the defendant to the victim. [352-353] LIACOS, C.J., and NOLAN, J., were of opinion that the evidence of DNA testing, although not prejudicial, was improperly admitted. WILKINS, J., concurring, agreed that the defendant was not prejudiced by the admission of this evidence, but expressed no view on its admissibility. ABRAMS, J., concurring, with whom LYNCH, J., joined, was of opinion that the admission of this evidence was proper.

There was no error in the denial of a criminal defendant's motions to suppress his statement to police, and to suppress as well certain items seized by police in a search of his automobile and his apartment to which the defendant had consented. [353-354]

At a murder trial, evidence of the defendant's prior illegal conduct was properly admitted as tending to show that he had the ability, opportunity, and knowledge to commit the crime with which he was charged. [354]

At a criminal trial, the defendant was not prejudiced by the prosecutor's reference, in closing argument, to certain evidence which, even if improperly admitted, was not prejudicial. [354-355]

At a criminal trial, the prosecutor's reference, in closing argument, to the defendant's prior arrest for soliciting a prostitute did not invite an improper inference from evidence of prior illegal conduct but, rather, viewed in context, was a reference to the defendant's opportunity, knowledge, and ability to commit the crime with which he was charged. [355]

INDICTMENT found and returned in the Superior Court Department on December 30, 1988.

Pretrial motions to permit the introduction of evidence of scientific tests, and to suppress evidence, were heard by *Suzanne V. DelVecchio*, J., and *William H. Carey*, J., respectively. The case was tried before *Cortland A. Mathers*, J.

*Juliane Balliro* for the defendant.

*Robert C. Thompson*, Assistant District Attorney, for the Commonwealth.

LIACOS, C.J. The defendant, Dana A. Daggett, was convicted of murder in the first degree by reason of extreme atrocity or cruelty. The principal claim of error the defendant makes is that evidence of tests performed on the victim's deoxyribonucleic acid (DNA) and DNA extracted from blood in the trunk of the defendant's automobile and blood found at the plant where defendant worked was improperly admitted at trial. The defendant contends that the error committed requires a new trial. The author of this opinion and Justice Nolan conclude that the evidence was not properly admitted; a majority of the quorum concludes that any error was not prejudicial. Therefore, we affirm.

There was evidence of the following facts. On Saturday, November 5, 1988, the body of the victim was found along a path in a wooded area of Pembroke. The victim had been a prostitute working in Brockton. She had been stabbed thirty-seven times. The absence of blood near her body indicated that she had died elsewhere and then was transported to that spot. The only clothing on her body was a pair of socks.

The defendant worked as a water pump operator at a water treatment plant in Pembroke. On Thursday, November 3, 1988, his shift began at 10 P.M. and ended at 6 A.M. on Friday. He was the only employee on that shift. The evidence presented by the Commonwealth tended to show that the defendant left the plant during his shift to solicit a prostitute, took the victim to the plant, killed her there, and then transported the victim's body in the trunk of his automobile to the wooded area where the body was discovered.

The defendant's coworkers testified that, on Friday morning, an area of the pump room floor appeared freshly mopped. They testified they saw what they believed to be blood stains at various locations in the plant. Among other places, human blood was found on the stairs, the leg of a podium, a wooden chair, a table, the floor, and a mop in a bucket of water. Blood was also found on a mat in the trunk of the defendant's automobile. Serologic tests other than DNA testing indicated that the blood was consistent with the victim's blood, but not the defendant's, and that approximately 4.5 per cent of the general population has blood consistent with these stains.

Hairs from the trunk of the defendant's automobile were consistent, in approximately thirty microscopic characteristics, with the victim's hair. Pubic hair consistent with the defendant's was found on the victim's body. Paint chips taken from the trunk of the automobile were consistent with paint on the floor of the water treatment plant and paint chips found on the victim's socks.

A box containing charred clothing was found in the basement of the plant several days after the victim's body had been discovered. The victim's roommate testified that the victim was wearing these clothes when the roommate had last seen her. A charred metal barrel also was recovered at the plant. The Commonwealth presented evidence that the barrel, the ground near where it was found, and some of the clothing found in the box contained traces of an accelerant.

In addition, the Commonwealth offered evidence of DNA testing by Cellmark Diagnostics laboratory (Cellmark) to prove that the blood found on the chair and the table in the plant, and on the mat in the trunk of the defendant's automobile, was the victim's blood. At trial, the Commonwealth's expert witnesses testified to the process of DNA comparison testing and concluded that it was "highly likely" (or some other nonnumerical term) that the blood found on the chair, the table, and in the trunk came from the victim.

The evidence of DNA testing was the subject of a five-day pretrial hearing conducted in April and May, 1990. The pur-

pose of the hearing was to determine whether the scientific theory and process underlying the forensic use of DNA technology is generally accepted by the relevant community of scientists.[1] See *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). See also *Commonwealth v. Curnin*, 409 Mass. 218, 222-223 (1991); *Commonwealth v. Mendes*, 406 Mass. 201, 205 (1989).

At the time of the *Frye* hearing, and at the time of trial, this court had not yet issued its opinions in *Commonwealth v. Lanigan*, 413 Mass. 154 (1992), and *Commonwealth v. Curnin*, 409 Mass. 218 (1991). In both of those cases, we held that evidence of DNA testing was inadmissible because the methods used by Cellmark to calculate the statistical probability of a random match were not generally accepted by the relevant scientific community.[2] *Lanigan, supra* at 163.

---

[1]We shall not in this case repeat a discussion of the basic processes involved in Restriction Fragment Length Polymorphism (RFLP) analysis of DNA, the basic scientific acceptance of which is not disputed. A description of RFLP analysis can be found in *Commonwealth v. Curnin*, 409 Mass. 218, 227-231 (1991).

[2]Recent cases from other jurisdictions confirm what we noted in *Curnin*, *supra* at 222 n.7, i.e., the importance to courts and to the scientific community of a valid statistical analysis of the likelihood of a match. See *People v. Axell*, 235 Cal. App. 3d 836, 866-867 (1991) (match means little without data on probability; calculation of statistical probability an integral part of process); *Fishback v. State*, 851 P.2d 884, 893 & n.18 (Colo. 1993) (match unaccompanied by statistical significance "essentially meaningless"); *State v. Vandebogart*, 135 N.H. 365, 381-382 (1992) (match "virtually meaningless" without statistical probability expressing frequency). Likewise, the National Research Council's April, 1992, report entitled DNA Technology in Forensic Science (NRC Report), stresses that: "To say that two patterns match, without providing any scientifically valid estimate (or, at least, an upper bound) of the frequency with which such matches might occur by chance, is meaningless." NRC Report at S-8.

Justice Abrams, in concurrence, *post* at 357, cites *Prater v. State*, 307 Ark. 180 (1991), in which the court held that evidence of a match, stripped of all information regarding the likelihood of a match, would be admissible. The *Prater* court's bald assertion stands in stark contrast to the conclusions reached in *Curnin, supra*, the cases cited above, and a host of others. See, e.g., *United States v. Yee*, 134 F.R.D. 161, 181 (N.D. Ohio 1991); *People v. Barney*, 8 Cal. App. 4th 798, 820 (1992). Moreover, it is a puzzling assertion in light of the fact that the court recognizes, later in

*Curnin, supra* at 227. The same assumptions underlying the statistical calculations made in those cases were relied on in this case.[3] Thus, the conclusions reached by the Commonwealth's experts suffer from the flaws that were exposed in *Curnin* and *Lanigan*. The author of this opinion and Justice Nolan conclude that the evidence of DNA testing should not have been admitted.[4]

---

its opinion, that "[o]nce two or more DNA patterns derived from loci that are known to be polymorphic (different among individuals) have been matched, the question arises whether this matching is coincidental. This is the point at which statistics begin to play a role." *Prater, supra* at 198. Apparently, the *Prater* court did not believe that this role was critical to the admissibility of DNA evidence. In accordance with the view of the relevant scientific community, see note 4, *infra*, this court does. (We note that Arkansas does not employ the *Frye* standard, and uses instead a more liberal relevancy test. Thus, the fact that the scientific community requires evidence of the significance of a match would not be dispositive.)

[3]The methods at issue in both *Lanigan* and *Curnin* were those of Cellmark and appear to be essentially the same methods at issue here.

[4]The fact that the Commonwealth presented the evidence to the jury in nonnumerical terms does not alter this result. The Commonwealth has cited no authorities and presented no testimony either at the *Frye* hearing or at trial that the use of such terms is generally accepted by the scientific community in evaluating the significance of a match. Although the Commonwealth's experts testified that, in their opinions, evidence of a match indicated that the source of the samples was "highly likely" (or some other such phrase), no one testified that such characterizations alleviate the concerns the scientific community has voiced regarding the evaluation of matches. See *State* v. *Cauthron*, 120 Wash. 2d 879, 907 (1993) (testimony of nonstatistical opinion presented insufficient because it did not include the background probability information). See also *State* v. *Alt*, 504 N.W.2d 38, 52 (Minn. Ct. App. 1993), and materials cited ("[N]onstatistical opinion testimony . . . would not correctly reflect the nature of the DNA test results. . . . The scientific community considers the statistical frequency important in interpreting DNA test results, but does not consider the opinion of a match to be significant").

The concurrence mischaracterizes this opinion when it states, *post* at 356, "I do not agree that the DNA evidence offered by the Commonwealth in this case was inadmissible because the Commonwealth's experts' testimony concerning the background probability that the DNA matches in question were false was not presented numerically." The point is not that *this court* should require a numerical frequency, but that the scientific community clearly does. If the relevant scientific community generally accepted some nonnumerical expression of statistical frequency, then this court would likely accept it as well. See *Commonwealth* v. *Beausoleil*, 397

The Commonwealth argues that, even if it was error to admit the evidence of DNA testing, reversal is not necessary because the defendant was not prejudiced by the evidence. A majority of the quorum agrees.[5]

As described above, DNA tests were performed on blood samples recovered from the chair and table at the plant, and from the trunk of the defendant's automobile. As regards the DNA testing of the blood found on the chair and table at the plant, we note that defense counsel conceded in her closing argument that the victim had either been killed at the plant or brought there afterward (thus implicitly conceding that the blood at the plant came from the victim). She characterized the evidence other than the DNA testing that the victim had been killed at, or brought afterward to, the plant as "compelling." Given this concession, we can say confidently that the DNA analysis tending to show that the blood at the plant was the victim's was merely cumulative of other overwhelming evidence and its admission was not prejudicial.

The only other DNA evidence concerned the blood found in the trunk of the defendant's automobile. Significant other evidence tended to show that the victim's body had been placed in the trunk. Blood typing tests revealed that the

---

Mass. 206, 218-219 (1986). There was simply no evidence presented below that indicated that this might be the case, and, as the cases cited above illustrate, there is a substantial indication to the contrary.

The concurrence's reliance on *Prater* v. *State*, *supra*, for the proposition that "not all courts have said that the likelihood must be stated numerically," *post* at 357, is misplaced. Significantly, the *Prater* court was speaking not to the question whether a nonnumerical (as opposed to numerical) indication of likelihood was acceptable, but to whether *any* evidence of likelihood is necessary. See note 2, *supra*.

[5]The defendant argues that the improper admission of DNA evidence was not "harmless beyond a reasonable doubt." As the Commonwealth notes, this standard applies only to constitutional errors. See *Commonwealth* v. *Sires*, 413 Mass. 292, 297 (1992). Because the error here was not a constitutional one, our inquiry is whether the improper admission of the evidence constituted prejudicial error. See *Commonwealth* v. *Schulze*, 389 Mass. 735, 741 (1983). Under this standard we consider whether "the error possibly weakened [the defendant's] case in some significant way so as to require a new trial." *Id.* For the reasons stated, we conclude that this is not the case here.

blood on the trunk mat was consistent with the victim's blood, but not the defendant's, and that only 4.5 per cent of the population has blood consistent with those stains. Human blood, also consistent with the victim's, was found on other items in the trunk, including weather stripping, a wheel guard, and ropes. Hair recovered from the trunk was consistent with the victim's hair. Paint chips found in the trunk of the defendant's automobile and on the victim's body were consistent with each other and paint on the floor of the plant. Also linking the defendant to the victim was evidence showing that pubic hairs consistent with the defendant's were found on the victim's body.

We believe that the evidence of DNA testing performed on the blood from the trunk mat was cumulative of this other evidence. See *People* v. *Barney*, 8 Cal. App. 4th 798, 825-826 (1992). In light of the fact that the Commonwealth was not able to present strong evidence of a DNA match for the blood from the trunk,[6] we conclude that the error was not prejudicial.

We turn to the other issues raised in this appeal.

*Motions to suppress.* Four days after the victim's body was discovered, the defendant was transported from the plant to the Pembroke police station shortly after he arrived for his evening shift. At the station he signed a consent form giving officers the authority to search his automobile and apartment and provided the officers with a statement of his activities during the preceding week. He moved to suppress the statement and the items seized, and a hearing was held on his motions. The record amply supports the judge's denial of Daggett's motions. Daggett does not direct us to any particu-

---

[6]Each of the experts testified to seeing a different number of "bands" in the trunk mat "lane." The expert from Cellmark, Dr. Robin Cotton, testified that she would not declare a match because the results were inconclusive.

We note also that, unlike *Curnin*, the jury were not exposed to claims that only one person (the defendant) in 59,000,000 would have the DNA components disclosed by the test. *Curnin, supra* at 222. Thus, the possible impact on the jury of the DNA evidence in this case was markedly weaker.

lar error in the findings contained in the judge's memorandum of decision and order, and we perceive no error.

*Evidence of prior illegal conduct.* The Commonwealth was allowed to present testimony (over the defendant's objection) that approximately ten months prior to the victim's stabbing, the defendant was arrested for soliciting a prostitute. On the night of this arrest, the defendant was assigned to the overnight shift at the water treatment plant. The Commonwealth argued that the evidence was admissible as evidence of the defendant's ability, opportunity, and knowledge to commit the crime, since he worked the overnight shift at the time the victim was allegedly killed. To support its contention, the Commonwealth introduced records from the plant that showed that the defendant had made certain hourly recordings on both nights. This evidence tended to show that, despite his work schedule and the log records, the defendant nonetheless had the opportunity, ability, and knowledge necessary to solicit and pick up a prostitute in Brockton. The judge gave limiting instructions both at the time the evidence was presented and when he charged the jury.

Although the question is a close one, we cannot say that the judge abused his discretion in allowing the Commonwealth to present this testimony. The judge instructed the jury that the probative force of the evidence was not that the defendant "has a bad character," in that he picked up prostitutes. The judge told the jury that they could "consider the evidence to the extent it may be found to establish a plan or scheme or a particular way of doing something or the opportunity to do something." See *Commonwealth* v. *Otsuki*, 411 Mass. 218, 235-236 (1986); *Commonwealth* v. *Young*, 22 Mass. App. Ct. 452, 456 (1986). See also P.J. Liacos, Massachusetts Evidence 420 (5th ed. 1981 & Supp. 1985). As long as it is admissible for a purpose other than impugning character, relevant evidence does not become inadmissible because it indicates a prior offense. *Commonwealth* v. *Robertson*, 408 Mass. 747, 750 (1990).

*Remarks in the prosecutor's closing argument.* The defendant contends that reversible error was committed when

the prosecutor made two improper comments in his closing argument. The first comment concerned the interpretation of the DNA test results. The prosecutor made a reference to "lottery type numbers" that, given the earlier determination that no numbers would be presented, could be perceived as a fact not in evidence. See *Commonwealth v. Connor*, 392 Mass. 838, 853 (1984). However, given our conclusion that the DNA evidence was not prejudicial, we conclude that any error created by this comment was likewise not prejudicial.

The defendant also claims prejudicial error in the prosecutor's closing statements regarding the defendant's prior arrest for soliciting a prostitute.[7] While the prosecutor's choice of the phrase "linking this defendant to [the victim]," appears, in isolation, to be an improper inference from the evidence of the prior bad act, when viewed in the context of the entire comment, it is clear that the prosecutor was simply referring to the defendant's opportunity, knowledge, and ability to commit the crime. Moreover, the jury were instructed at least twice about the limited extent to which they could consider this evidence. They were also instructed that "statements made by counsel in their closing arguments may not be used by you as a basis for any factual finding." There was no error. See *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 232 (1992).

*Review under G. L. c. 278, § 33E.* Although the defendant has not made any argument that we should set aside or modify the verdict under our extraordinary power of review in a capital case, see G. L. c. 278, § 33E (1992 ed.), we have reviewed the entire record in fulfilment of our statutory obli-

---

[7]The prosecutor stated: "Has the defendant ever done this before? Yes, he has, and arrested for it. It was on a night that he was working, a night that all of the records indicate that he was there all night. You've heard testimony that this defendant would make it a regular practice to leave for hours at a time and would come up to Brockton to visit his brothers, amongst other people. I suggest to you, that, again, is evidence linking this defendant to [the victim]. Is it conclusive? Of course not. What we're talking about here is circumstantial evidence . . . ."

gation to do so. We perceive no reason to alter the verdict of the jury.

*Judgment affirmed.*

WILKINS, J. (concurring). I decline to debate the question whether the evidence of the DNA testing should have been admitted. The Chief Justice is correct that the defendant was not prejudiced by the admission of the evidence, even if it was inadmissible.

ABRAMS, J. (concurring, with whom Lynch, J., joins). I concur that the judgment should be affirmed. However, I believe that the judge correctly permitted the Commonwealth to offer the DNA evidence.

I do not agree that the DNA evidence offered by the Commonwealth in this case was inadmissible because the Commonwealth's experts' testimony concerning the background probability that the DNA matches in question were false was not presented numerically.[1] In *Commonwealth v. Curnin,*

---

[1] In *Commonwealth v. Lanigan,* 413 Mass. 154 (1992), and *Commonwealth v. Curnin,* 409 Mass. 218 (1991), the Commonwealth offered numerical assessments of the likelihood that the DNA matches in question in those cases were false. The court held that these numerical likelihood assessments were inadmissible because they relied on a general population database which the scientific community did not generally consider to be reliable. The scientific community appears to have come to agreement on a means to correct for the DNA frequency calculation errors that might be associated with the use of a general population database. The National Research Council (NRC) has concluded that a numerical statistical analysis concerning the probability that a given DNA match is false which is based on a general population database would be reliable as long as the "ceiling frequency" approach was employed in making the calculation.

The "ceiling frequency" approach accounts for the impact that population substructure might have on a DNA frequency estimate by incorporating into its calculation "the greatest observed frequency of particular alleles within a given number of randomly selected population groups." *Lanigan, supra* at 163. The NRC states that, by using the "ceiling frequency" approach in the calculation of DNA frequencies, the judicial system can ensure that "any error in calculating profile frequencies that is

409 Mass. 218 (1991), the court held that expert testimony concerning a DNA match must be accompanied by some background information indicating the probability that the match in question might have occurred by chance. Specifically, we said that "we would not permit the admission of test results showing a DNA match . . . without telling the jury anything about the likelihood of that match occurring." *Id.* at 222 n.7, quoted in *Commonwealth* v. *Lanigan*, 413 Mass. 154, 159 (1992). The court did not declare that the likelihood must be stated numerically and in no other terms. Further, not all courts have said that the likelihood must be stated numerically. In *Prater* v. *State*, 307 Ark. 180 (1991), the Supreme Court of Arkansas stated that "[e]vidence of a DNA match made by a scientist who followed the proper laboratory protocol is admissible without drawing any statistical inferences. The scientist could simply testify to having performed the necessary steps and having determined that the two (2) samples examined match. The next step of extrapolating calculations as to the probability of random matches is not an essential step to DNA identification testing . . . ." *Id.* at 197. I think it is unfair to the Commonwealth to retroactively require the experts to state their opinions numerically.[2]

---

caused by population substructure [shall] accrue to the benefit of the individual against whom the DNA testing is being used." *Lanigan, supra* at 163, citing the Report of the National Research Council's Committee on DNA Technology in Forensic Science, entitled DNA Technology in Forensic Science at 3-13 (1992). Specifically, the NRC declares that any "ceiling frequency" based DNA match calculation would be "fair to suspects, because the estimated probabilities are likely to be conservative in their incriminating power." *Id.* at 3-13.

If the NRC's conclusion regarding the ability of the "ceiling frequency" approach to correct for the errors that might result from the use of a general population database reflects that of the general scientific community, a numerical assessment concerning the likelihood that a given DNA match is false which relies on a general population database could be admissible if the "ceiling frequency" method of calculation is employed by the expert.

[2]The Commonwealth is not solely responsible for the absence of numerical probability assessments in this case. At various times during both the *Frye* hearing and the trial, the defense objected, on what appears to be a variety of reasons, to questions posed by the prosecutor which invited com-

In their testimony, the Commonwealth's experts testified at length in nonnumerical terms about the background probability that the DNA matches in question were false. Specifically, Doctors Cotton, Housman, and Keith each noted that the probes used in this case detect stretches of DNA that are highly variable between individuals (i.e., highly polymorphic). They each then observed that it would be highly unlikely for two DNA samples to match along one, let alone four highly variable stretches of DNA, as they did here, unless they came from the same person. Even the defendant's own expert acknowledged that, if two sets of DNA samples matched along four highly variable stretches of DNA, it would be highly likely that they came from the same person.[3]

The nonnumeric background probability estimates offered in this case by the Commonwealth's experts were based on their extensive reading of the relevant scientific literature and on their considerable personal experience in analyzing probe results. These estimates were based on scientifically reliable sources. I conclude that the trial judge correctly admitted the expert opinions.

---

ment on the statistical probability that the DNA matches in question were false.

[3]At the *Frye* hearing, the prosecutor asked the defense expert, "Doctor, you agree that the probes that were used here are highly polymorphic, do you not?" The defense expert answered, "Yes, I do." The prosecutor then asked, "And if there [were] matches on all four probes, . . . there is a great likelihood [that the DNA samples] would be from the same source, right?" The defense expert responded, "If there [were] matches, yes."