COMMONWEALTH *vs.* RICHARD VEGA.

No. 92-P-1571.

Suffolk. December 10, 1993. - June 10, 1994.

Present: PERRETTA, KASS, & IRELAND, JJ.

*Deoxyribonucleic Acid. Rape. Practice, Criminal*, Required finding, Sentence, Duplicative punishment. *Evidence*, Fresh complaint, Scientific test, Competency.

Evidence at the trial of indictments for rape in three counts was sufficient to warrant denial of the defendant's motion for a required finding of not guilty on the count of unnatural rape. [636-637]

At the 1990 trial of indictments for rape in three counts, evidence that deoxyribonucleic acid (DNA) in blood samples taken from the defendant matched DNA in fluid samples swabbed from the victim and taken from her garments was incorrectly admitted [638-639]; where other evidence of the defendant's identification was strong and where the error did not weaken the defendant's case in any significant way, the defendant did not demonstrate any prejudice from the incorrect admission of the evidence [639-640].

There was no error in a criminal case in the imposition of consecutive sentences on multiple counts of rape in two indictments arising from one criminal episode where the allegations and proof of those counts were not duplicative. [640-641]

INDICTMENTS found and returned in the Superior Court Department on September 18, 1987, and March 10, 1989, respectively.

The cases were tried before *James D. McDaniel, Jr.*, J.

*Stephen J. Weymouth* for the defendant.

*Vincent R. McDonough*, Assistant District Attorney, for the Commonwealth.

KASS, J. Richard Vega was convicted by a jury of three counts of rape. In his appeal, Vega challenges the admissibility of evidence that DNA[1] in samples of his blood matched

[1]Deoxyribonucleic acid.

DNA in seminal fluid on the victim's underwear. He also claims error in the denial of his motion for a required finding of not guilty, instructions to the jury defining sodomy, and the imposition of a successive sentence on the conviction of natural rape to follow the sentence served on the conviction of unnatural rape (nineteen and one-half to twenty years at the Massachusetts Correctional Institution [M.C.I.], Cedar Junction).

The victim, a native of Texas, had come to visit her ailing fifty-nine year old son in Revere and sojourned in his apartment in that city. Late in the afternoon on August 7, 1987, Debra Swasey, a woman friend of the victim's son, turned up at the Revere apartment for a change of clothes and a shower. She was accompanied by a man who was asked to wait outside. About one-half hour after he and the woman had left the Revere apartment in a blue van, he returned and secured entrance to the apartment on the pretext of wishing to talk to the victim about her son. There ensued brutal forced vaginal and anal rapes. The victim identified the defendant as the assailant. Other facts which the jury might have found from the evidence are best left to discussion of the various points of appeal.

1. *Required finding of not guilty.* There was sufficient evidence against the defendant to take to the jury the charge of natural rape, and the defendant does not contend otherwise. The defendant does urge, however, that the evidence of unnatural, i.e., anal rape, failed under the standard formulated in *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). See also *Commonwealth* v. *Helfant*, 398 Mass. 214, 216 (1986); *Commonwealth* v. *Young*, 35 Mass. App. Ct. 427, 428-429 (1993). Evidence of anal penetration, the defendant argues, is missing.

In her testimony, the victim, untutored in the niceties of legal presentation, was wont to proceed to the heart of the matter. When asked, "And after the clothing was down, ma'm, what happened," she responded: "He raped me." Asked to explain what the assailant had done, she said: "His penis went into my vagina." Asked what the assailant did

thereafter, she said, "He flipped me over and then he sodomized me." The phrase "sodomized me," the defendant contends, inadequately expresses the idea of penetration. In context and in terms of the ordinary meaning of "sodomy," anal copulation, the jury could have inferred penetration. Cf. *Commonwealth* v. *Coderre*, 360 Mass. 869 (1971); *Commonwealth* v. *Brown*, 9 Mass. App. Ct. 609, 611 (1980); *Commonwealth* v. *Nelson*, 17 Mass. App. Ct. 947, 948 (1983). See also *State* v. *Langelier*, 136 Me. 320, 321 (1939). In any event, there was additional evidence. An emergency room nurse at Brigham and Women's Hospital, who treated the victim, took swabs from the victim's rectal, as well as vaginal, area. Microscopic analysis revealed spermatozoa in the samples from the rectal area. Seminal fluid was also found on slides with samples from the rectal area and the anterior portion of the victim's underwear. There was fresh complaint testimony from the emergency room nurse — not received for substantive purposes — that the victim had told her that the assailant had first penetrated her vaginally and then flipped her over and penetrated her "in her bottom." As to the propriety of that testimony, see *Commonwealth* v. *Licata*, 412 Mass. 654, 657 (1992), and *Commonwealth* v. *Gardner*, 30 Mass. App. Ct. 515, 523 (1991).

The motion for a required finding of not guilty on the count of unnatural rape was rightly denied.

2. *Admissibility of DNA evidence.* During the course of investigation of the rape and preparation of the case against Vega, the Commonwealth sent swatches with samples of the defendant's blood, rectal swabs from the victim, and samples of her clothes to Lifecodes Corporation in Valhalla, New York. Lifecodes' assignment was to analyze those samples to see if the DNA in the blood samples taken from Vega matched the DNA in the fluid samples swabbed from the victim and taken from her garments. Witnesses from Lifecodes were permitted to testify about the DNA identifying process in theory as well as the steps taken and conclusions reached on the basis of the samples studied in this case. Four probes or bands were studied and they matched. One of

the witnesses from Lifecodes testified that "it's extremely unlikely that you would find anybody that would share [with some one else] bands on all four systems."

Vega's trial occurred in late November, 1990. Earlier that year, in May, in another case,[2] a judge of the Superior Court had conducted a voir dire to determine whether the methodology as applied was accepted in the scientific community. See *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923).[3] That judge had decided the evidence could be received and wrote a detailed memorandum articulating her reasons. On the strength of that memorandum, the trial judge in the instant case allowed the DNA comparison evidence offered by the government. That action was over a defense objection.[4]

In the years following Vega's trial, the Supreme Judicial Court published a trilogy of cases dealing with DNA matching evidence: *Commonwealth* v. *Curnin*, 409 Mass. 218 (1991)[5]; *Commonwealth* v. *Lanigan*, 413 Mass. 154 (1992); and *Commonwealth* v. *Daggett*, 416 Mass. 347 (1993). The upshot of those cases was that while the underlying technique of DNA matching, Restriction Fragment Length Polymorphism, was regarded as acceptable in the scientific community, see *Daggett* at 350 n.1, the methods of statistical analysis used to determine whether the DNA match might have been a random one were not so generally accepted and,

---

[2]That case was *Commonwealth* v. *Daggett*, later reviewed at 416 Mass. 347 (1993).

[3]See also the re-examination of that standard in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 113 S. Ct. 2786 (1993).

[4]For all that, defense counsel exhibited interest in the technology. The defense applied for, and received ·funds, to have an independent DNA comparison made by Cellmark Diagnostics laboratory of Germantown, Maryland. Three major players in the DNA profiling business are Lifecodes, the service used by the Commonwealth in the case before us, Cellmark, and the Federal Bureau of Investigation. Hoeffel, Note, "The Dark Side of DNA Profiling: Unreliable Scientific Evidence Meets the Defendant," 42 Stan. L. Rev. 465, 471 (1990). Cellmark's report was not offered by the defense, and a motion to have the defense release the Cellmark report to the prosecution was denied.

[5]There is appended to the *Curnin* opinion an appendix (at 227-231) describing in some detail the theory, scientific underpinning, and method of DNA comparison analysis.

therefore, evidence of DNA testing was inadmissible. *Curnin, supra* at 227. *Daggett, supra* at 350. It follows that the evidence matching Vega's DNA with that found on the victim was wrongly admitted.[6] Although scientific evidence has the capacity to pack a potent evidentiary wallop, see *Curnin* at 219, it is open to a reviewing court to inquire whether the erroneously received evidence prejudiced the defendant's case; more particularly, whether "the error possibly weakened [the defendant's] case in some significant way." *Commonwealth* v. *Schulze*, 389 Mass. 735, 741 (1983). *Commonwealth* v. *Daggett*, 416 Mass. at 352 n.5. We turn to that question.

3. *Prejudice to defendant from erroneous admission of DNA matching evidence.* The conventional evidence against Vega was formidable. He had first been observed by the victim when he accompanied Swasey to the Revere apartment. When, after leaving with Swasey, he returned alone, the victim recognized the man she later identified as the defendant as the person who had earlier accompanied Swasey. From the time she first saw the defendant until he left after the rape, an hour and a half had elapsed. Her exposure to the defendant was considerable, and it was daytime. An inquisitive and observant neighbor noticed the defendant arrive first with a woman, leave with her, then reappear and leave the Revere apartment at a time interval consistent with the rape. She observed the type of van the defendant arrived and left in each time he had come. Her description of that van, gray or faded powder blue and somewhat old, matched what the victim had described as the vehicle used by the defendant when he left after the assault. Indeed, the person the neighbor had observed had said "hello" to her on his second visit. Both the victim and the neighbor independently identified the defendant from photo arrays. The victim made an in-court

---

[6]The Commonwealth may not derive help from the more favored "interim ceiling principle" method of probability calculation, as opposed to the "product rule" method disdained in *Curnin, Lanigan,* and *Daggett.* The interim ceiling principle was not applied by Lifecodes to its data until after the trial.

identification at a probable cause hearing and at trial. During conversation with the victim preceding the sexual attack, the assailant had said he was employed as a carpet layer and had a brother who was in jail. That information was corroborated by a former coworker, James Moccio, called by the Commonwealth, and Vega's wife, who had been called by the defense. Both Moccia and Vega's wife testified that Vega owned a blue van.

In addition to this powerful web of evidence from percipient witnesses, the government offered evidence, through methods other than DNA matching, that semen recovered from the victim's slacks and underwear was consistent with having come from the defendant. The presentation of the DNA evidence, while hardly a minor episode in the trial — it consumed a day — ended in a far less dramatic fashion than in *Commonwealth* v. *Curnin*, 409 Mass. at 219, in which the jury were told that only "one Caucasian in 59,000,000" would have matching DNA. Rather, as we have observed, the jury were told, less compellingly, that a match was "extremely unlikely." In final argument, the prosecutor reviewed in some detail the evidence given by the victim, the neighbor, and Swasey, who had accompanied the defendant. The scientific evidence was underplayed. All that the prosecutor had to say about it was, "you also have all that scientific evidence which corroborates their identifications." As in *Daggett*, the conventional evidence is so powerful that the DNA evidence, particularly taking into account the manner in which it was soft-pedalled, did not weaken the defendant's case in any significant way. 416 Mass. 351 n.4, 353.

4. *Successive sentences.* On the conviction of unnatural rape, i.e., the anal penetration, the judge imposed a sentence of from nineteen and one-half to twenty years at M.C.I., Cedar Junction. For the two counts of vaginal rape, the judge imposed a sentence of the same duration, to commence "from and after" the unnatural rape sentence. The judge, however, suspended the "from and after" sentence, subject to probation for ten years.

The defendant contends that the judge erred in imposing successive sentences for offenses, which, however much they may be susceptible of separate identification, nonetheless occurred in the course of one criminal episode. The question was discussed — in the context of a quite different crime — in *Commonwealth* v. *Donovan*, 395 Mass. 20, 27-31 (1985). There the defendants had counterfeited a night deposit box, attached it to a bank, and helped themselves to the night's deposits, placed there by seven separate customers. The court held that the theft had been a single larcenous episode and that subjecting the defendants to trial and punishment for seven indictments — one for each depositor — was duplicative and, hence, unlawful. We are to consider "the realities of the offenses and the circumstances within which they occur." *Costarelli* v. *Commonwealth*, 374 Mass. 677, 684 (1978). *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 663 (1979). In *Commonwealth* v. *Fitzpatrick*, 14 Mass. App. Ct. 1001, 1003 (1982), we described a second penetration of a rape victim during the same episode as a separate crime. Surely the victim must so experience it, especially when, as here, the acts differed in kind. Cf. *Commonwealth* v. *Tarrant*, 14 Mass. App. Ct. 1020 (1982) (discrete robberies from the same victim during the course of one invasion of the building in which that victim lived). The realities of the multiple attacks on the victim warranted — although they did not require — multiple indictments and consecutive sentences.

Our discussion of the foregoing points disposes of two other matters raised by the defendant's appeal, and we do not give them separate attention.

*Judgments affirmed.*