## COMMONWEALTH vs. PEDRO ROSARIO.

Suffolk. October 6, 1999. - December 30, 1999.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, & IRELAND, JJ.

*Constitutional Law,* Confrontation of witnesses. *Evidence,* Hearsay, State of police knowledge, Relevancy and materiality. *Error, Harmless. Practice, Criminal,* Argument by prosecutor, Capital case.

Discussion of the requirements for admission and permissible scope of hearsay evidence offered to explain the state of police knowledge. [508-510]

At the trial of a murder case, the judge erred in admitting in evidence testimony concerning the content of a witness's telephone conversation with the victim shortly before the murder, which was hearsay and not relevant to any permissible purpose [506-508, 510-511]; however, where other evidence of the defendant's guilt, including his admissions, was overwhelming, the error either did not influence the jury or had but very slight effect [511-515].

At a murder trial, hyperbolic comments in the prosecutor's closing argument, which were unprofessional and improper, were not prejudicial to the defendant, where they were not misleading as to any factual issues in dispute, and where the judge gave prompt and forceful curative instructions. [515-516]

INDICTMENTS found and returned in the Superior Court Department on June 10, 1996.

The cases were tried before *James D. McDaniel, Jr.,* J.

*Roger A. Cox* for the defendant.

*Paul M. Treseler,* Assistant District Attorney, for the Commonwealth.

MARSHALL, C.J. The defendant was convicted of murder in the first degree on theories of extreme atrocity or cruelty and felony murder. Aggravated rape was the underlying offense for felony-murder. On appeal he argues that the judge should have excluded testimony of the victim's roommate relating to a telephone conversation she had with the victim close to the time of the murder. He also challenges statements made by the prosecutor during closing argument. We affirm the convictions. We conclude that there is no basis for granting the defendant relief under G. L. c. 278, § 33E.

1. We recite the evidence in the light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with the issues raised. The victim was killed in the early hours of Saturday, September 23, 1995. She spent the preceding evening with one of her roommates, Susan O'Regan, and a group of approximately thirty friends. The victim and O'Regan left their apartment at approximately 6:30 P.M. on September 22, dined with some friends, and then joined other friends as the group took a trolley tour around Boston to celebrate an upcoming wedding. At approximately 1 A.M., both the victim and O'Regan disembarked from the trolley near their apartment in the Allston section of Boston. The friends remaining on the trolley attempted to convince them to return with them to the South Boston section of Boston. O'Regan agreed and reboarded the trolley, but the victim decided to return to their apartment. The victim began the walk home at approximately 1 A.M. She never arrived.

At approximately 9 A.M. on September 23, 1995, Officer John McGee of the Boston police department went to the West End House, a boys and girls club in Allston, adjacent to the victim's apartment. When he arrived, he was shown the body of the victim, located outside the West End House. The victim's body had sustained slash wounds on the neck and stab wounds to the chest, and there was blood coming from her head. Later that evening, Sergeant Detective Thomas J. O'Leary of the Boston police homicide unit met with the victim's roommates. At that meeting Shirley Harman told the detective about a telephone call she had received from the victim shortly after 1 A.M. on September 23. Based on that information, the police conducted a search and identified the defendant as a suspect. He was questioned several times by the police. Initially, he offered several alibis to the police claiming that he had spent the preceding night with his former girl friend, and denied meeting the victim. Later when his former girl friend recanted and when the police sought samples of his body fluids and hair, the defendant admitted to a sexual encounter with the victim on the night of the murder. The Commonwealth presented substantial evidence linking the defendant to the crimes. Other compelling evidence established that the defendant's sexual encounter with the victim could not have occurred as he described.

2. The judge admitted, over defense objection, Harman's detailed description of a conversation she had with the victim

before the murder. She told the jury that she went to sleep around 12:30 A.M. on September 23 and was awakened by a telephone call from the victim at approximately 1:15 A.M. The victim told Harman that she had had a good evening and that she was next door at the West End House with someone named "Tony." The victim invited Harman to join them for a drink, Harman declined, and the victim said she would come home in a few minutes.

Later in the trial, Sergeant O'Leary testified about the meeting he had with Harman: he acknowledged that he took steps to find someone named Tony after learning from Harman about her conversation with the victim.[1] At trial the defendant objected to this testimony as well. On appeal he challenges only the admission of Harman's testimony, and does not challenge O'Leary's testimony. He argues that Harman's testimony is inadmissible hearsay and its admission violated his rights under the confrontation clauses of both the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.[2] We consider first whether it was error for the judge to permit Harman to testify about her conversation with the victim and, if so, whether the error was "harmless beyond a reasonable doubt." *Commonwealth* v. *Daggett*, 416 Mass. 347, 352 n.5 (1993). See *Commonwealth* v. *Sires*, 413 Mass. 292, 297 (1992).

"The confrontation right is designed to make prosecution witnesses available for full cross-examination by the defendant and to ensure that the testimony of a witness is given under oath before the jury who will have an opportunity to observe the demeanor of the witness as he testifies." *Commonwealth* v. *Whelton*, 428 Mass. 24, 29 (1998), quoting *Commonwealth* v.

---

[1]On direct examination, the prosecutor asked: "Sergeant O'Leary, after you met with Shirley Harman and learned that the last person who spoke to [the victim] was a man named Tony, did you take some steps to find a person named Tony?" Sergeant O'Leary responded: "I did." O'Leary did not testify further about Harman's conversation with the victim. Harman did not tell the jury that she related the content of her conversation with the victim to Sergeant O'Leary.

[2]Where the defendant offers no basis for concluding that the difference in language between the right of confrontation under the Massachusetts Constitution and the cognate guarantee under the Federal Constitution offers greater protection under the former, we have said that there is no greater protection under the Massachusetts Constitution for questions involving the admissibility of hearsay statements against criminal defendants. *Commonwealth* v. *Whelton*, 428 Mass. 24, 28 (1998), and cases cited. As discussed at note 3, *infra*, the defendant does make such an argument here.

*Canon*, 373 Mass. 494, 509 (1977) (Liacos, J., dissenting), cert. denied, 435 U.S. 933 (1978). See *Mattox* v. *United States*, 156 U.S. 237, 242-243 (1895). Nevertheless, in a criminal trial extrajudicial statements may be admitted in some circumstances even where the witness who made the statements is not available to testify. The Commonwealth contends that in this case it was permissible for Harman to testify about the content of her telephone conversation with the victim because that evidence was to show the "state of police knowledge." As such, the Commonwealth argues, Harman's testimony was not offered for the truth of its content, and for that reason the confrontation rights of the defendant are not implicated. We disagree. Harman's testimony should not have been admitted.[3]

We have permitted the use of carefully circumscribed extrajudicial statements in criminal trials to explain the state of police knowledge. See *Commonwealth* v. *LaVelle*, 414 Mass. 146, 155-156 (1993); *Commonwealth* v. *Cohen*, 412 Mass. 375, 393-394 (1992); *Commonwealth* v. *Miller*, 361 Mass. 644, 658-659 (1972). We have explained that "an arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct." *Commonwealth* v. *Cohen, supra* at 393, quoting McCormick, Evidence § 249, at 734 (E. Cleary 3d ed. 1984). It goes without saying that the testimony may not be used for the truth of the statements that

---

[3]In the case of criminal trials we require a greater level of scrutiny of hearsay statements and have said that such evidence can be introduced against a criminal defendant only if the statements bear "adequate 'indicia of reliability.' " *Commonwealth* v. *Trigones*, 397 Mass. 633, 637 (1986), quoting *Ohio* v. *Roberts*, 448 U.S. 56, 65-66 (1980). The reliability of a hearsay statement, we have concluded, "can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *Commonwealth* v. *Trigones, supra* at 637-638, quoting *Ohio* v. *Roberts, supra* at 66. "In other situations, the evidence is admissible only if the prosecutor makes 'a showing of particularized guarantees of trustworthiness.' " *Commonwealth* v. *Trigones, supra* at 638, quoting *Ohio* v. *Roberts, supra*. The defendant argues that admission of an extrajudicial statement for the limited purpose of establishing the "state of police knowledge" is not a "firmly rooted" exception to the general rule precluding the admission of hearsay statements and, as such, would not overcome the protection afforded by art. 12 of the Massachusetts Declaration of Rights that a defendant meet the witnesses against him "face to face." We do not decide whether extrajudicial statements admitted to explain the state of police knowledge would contravene the "face to face" guarantees of art. 12 because we conclude that Harman's testimony was not properly admitted for that purpose.

served as the basis for the officer's knowledge. *Commonwealth* v. *Cohen, supra* at 393.

Testimony of this kind carries a high probability of misuse, because a witness may relate "historical aspects of the case, replete with hearsay statements in the form of complaints and reports" even when not necessary to show state of police knowledge. McCormick, Evidence, *supra.* We have therefore permitted this evidence only through the testimony of a police officer who must testify only on the basis of his own knowledge. See *Commonwealth* v. *LaVelle, supra* at 155-156 (detective testified to state of police knowledge that led to reliance on informant's tip to seek out defendant); *Commonwealth* v. *Cohen, supra* (officers testified that father's tip led to arrest of defendant); *Commonwealth* v. *Miller, supra* at 658-659 (officer testified to information that impelled his approach to defendant). See also McCormick, Evidence, *supra* (discussing officer's testifying that he acted "upon information received" or acquired).[4]

Second, the testimony must be limited to the facts required to establish the officer's state of knowledge. Disclosure of the substance of the conversation ordinarily is not required, and should be curtailed because of its prejudicial potential. See

---

[4]Where other jurisdictions have admitted extrajudicial statements to show police knowledge in order to explain police conduct, the witness is always an officer who testifies to the source of knowledge or reason for the particular police conduct. See, e.g., *United States* v. *Wilson,* 107 F.3d 774, 780-781 (10th Cir. 1997); *United States* v. *King,* 36 F.3d 728, 731-732 (8th Cir. 1994), cert. denied, 513 U.S. 1135 (1995); *United States* v. *Gonzalez,* 967 F.2d 1032, 1034-1035 (5th Cir. 1992); *United States* v. *Love,* 767 F.2d 1052, 1063 (4th Cir. 1985), cert. denied, 474 U.S. 1081 (1986); *Skiver* v. *State,* 336 Ark. 86, 95 (1999); *People* v. *Tenorio,* 197 Colo. 137, 145-146 (1979); *State* v. *Cruz,* 212 Conn. 351, 355-358 (1989); *Kearse* v. *State,* 662 So. 2d 677, 684 (Fla. 1995); *State* v. *Perez,* 64 Haw. 232, 234 (1981); *People* v. *Morgan,* 142 Ill. 2d 410, 446-447 (1991), rev'd on other grounds, 504 U.S. 719 (1992); *Long* v. *State,* 582 N.E.2d 361, 362 (Ind. 1991); *State* v. *Trotter,* 203 Kan. 31, 36-37 (1969); *Gordon* v. *Commonwealth,* 916 S.W.2d 176, 178-179 (Ky. 1995); *Swindle* v. *State,* 502 So. 2d 652, 657-658 (Miss. 1987); *State* v. *Dunn,* 817 S.W.2d 241, 243 (Mo. 1991), cert. denied, 503 U.S. 992 (1992); *State* v. *Lawrence,* 285 Mont. 140, 164-167 (1997); *State* v. *Gooden,* 133 N.H. 674, 678 (1990); *State* v. *Apodaca,* 118 N.M. 762, 770-771 (1994); *State* v. *Corbett,* 339 N.C. 313, 332-333 (1994); *State* v. *Braxter,* 568 A.2d 311, 314-315 (R.I. 1990); *State* v. *Brown,* 317 S.C. 55, 63 (1994); *State* v. *Collier,* 736 P.2d 231, 233-234 (Utah 1987); *Weeks* v. *Commonwealth,* 248 Va. 460, 476-477 (1994), cert. denied, 516 U.S. 829 (1995); *State* v. *Phelps,* 197 W. Va. 713, 721-722 (1996); *Olson* v. *State,* 698 P.2d 107, 113-114 (Wyo. 1985).

*Commonwealth* v. *Miller, supra* at 658-659 n.3 (recognizing potential prejudice of introducing testimony regarding police knowledge in entrapment case). The contours of this limitation were cogently explained in *Commonwealth* v. *Perez,* 27 Mass. App. Ct. 550, 554-555 (1989), quoting McCormick, Evidence, *supra*: "The specific description of the defendant given to the investigator is . . . seldom needed and the likelihood of prejudice is great. For this reason a statement that an officer acted 'upon information received,' or 'as a consequence of a conversation,' or words to that effect — without further detail — satisfy the purpose of explaining police conduct." See McCormick, Evidence, *supra* ("testimony that [officer] acted 'upon information received,' or words to that effect should be sufficient"). See also *United States* v. *Williams,* 133 F.3d 1048, 1052 (7th Cir. 1998) ("the officer's testimony must be limited to the fact that he spoke to an informant without disclosing the substance of that conversation"); *State* v. *Bankston,* 63 N.J. 263, 268 (1973) ("when the officer becomes more specific by repeating what some other person told him . . . the testimony violates the hearsay rule"); *Commonwealth* v. *Yates,* 531 Pa. 373, 375 (1992), quoting *Commonwealth* v. *Palsa,* 521 Pa. 113, 119 (1989) ("It is the prosecutor's duty to avoid the introduction of out-of-court statements that go beyond what is reasonably necessary to explain police conduct"); *State* v. *Braxter,* 568 A.2d 311, 315 (R.I. 1990) ("To avoid prejudicial impact of this type of hearsay testimony, it is necessary to limit police testimony to the fact that they 'received information' that led them to be where they were at a particular time").

Third, the police action or state of police knowledge must be relevant to an issue in the case. See P.J. Liacos, Massachusetts Evidence § 8.2.2, at 439 (6th ed. 1994) ("a party's knowledge of the contents of [out-of-court] statement must be material for them to be admissible"). See, e.g., *Gordon* v. *Commonwealth,* 916 S.W.2d 176, 179 (Ky. 1995) (limiting officer testimony "to circumstances where the taking of action by the police is an issue in the case and where it tends to explain the action that was taken"); *State* v. *Phelps,* 197 W. Va. 713, 722 (1996), quoting *State* v. *Maynard,* 183 W. Va. 1, 5 (1990) ("since the issue was not relevant to the prosecution, nor the defense, it was error to allow [the police officers] to testify about the anonymous phone call which implicated the defendant").

The testimony of Harman regarding the statements made to

her by the victim satisfies none of these criteria. She had no basis on which to explain police conduct and her testimony could not have been relevant for that purpose. Her testimony extended well beyond any permissible scope of information required to explain the conduct of the police. The circumstances of the police focus on the defendant were not at issue in this case. Harman's testimony about her telephone conversation with the victim was inadmissible hearsay, and not consistent with the confrontation guarantees of the State and Federal Constitutions.[5]

We turn to consider whether the judge's error in admitting the testimony over the defendant's objection requires reversal of his convictions. The error is one of constitutional dimension. "The admission of testimony obtained in violation of a defendant's confrontation rights will not amount to reversible error 'if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " *Commonwealth* v. *Miles*, 420 Mass. 67, 73 (1995), quoting *Delaware* v. *Van Arsdall*, 475 U.S. 673, 681 (1986). To make that determination, we examine a number of factors, including the importance of the evidence in the prosecution's case, the frequency of reference to the evidence, whether it was cumulative of other evidence and whether the other evidence against the defendant was overwhelming. *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 509 n.11 (1992); *Commonwealth* v. *Sinnott*, 399 Mass. 863, 872 n.8 (1987).[6]

Excluding Harman's testimony entirely from our consider-

---

[5]Moreover, the prosecutor used Harman's statements for the truth of their content. In his closing argument, the prosecutor referred to the conversation as a call for help:

> "Sure she's had a few drinks. Her defenses are down. But she tries to call out for help; and she calls her girlfriend . . . something in the back of her mind. 'I'm at the West End House with Tony. Come on over. If you can't come over, I'm coming home.' She's sending a message that is not received because the person is half asleep. But she was sending a message, and I think that message, from the evidence, would be suggestive of what she was trying to do. She was trying to give somebody a tip; Tony, West End House."

[6]"In *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696-697 (1983), we set out some guideposts for determining [whether] constitutional error is harmless beyond a reasonable doubt. We stated: 'In determining whether or not an error is harmless by weighing the prejudicial effect of the improper evidence, there

ation, the case against the defendant was overwhelming. Harman's testimony tended to show that the defendant was with the victim around the time of the murder near the site where the body was discovered. There was other compelling evidence that put the defendant with the victim in the early hours of September 23 near the West End House. The defendant admitted to the police that he had sexual relations with the victim on the night of the murder.[7] This was evidence of the most damaging kind, evidence that was strengthened by the defendant's patently dubious explanation of the circumstances of that encounter. He said that on that night he and a friend went to a local liquor store at around 8 P.M., and that he went into the store to purchase beer while his friend waited outside. When he emerged from the store, his friend was waiting outside with a "girl." The three then walked back toward his apartment building; during the walk, the defendant noticed the girl's Irish accent. The three of them went to the alley behind the apartment building, where they talked. The defendant claims that the discussion turned to sex, and shortly thereafter he had sexual relations with the "girl." He said that this encounter occurred at approximately 9 P.M.

There was compelling evidence that a sexual encounter with the victim could not have occurred as the defendant described. O'Regan, one of the victim's roommates, testified that she met the victim at 5 P.M. and they went shopping.[8] Multiple witnesses then testified about the victim's whereabouts until 1 A.M. the

---

are several factors which this court and others have considered: (1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions. These factors are not exclusive or exhaustive. Nevertheless, this scoreboard method to distinguish harmless or harmful error is useful.' (Footnotes and citations omitted.)" *Commonwealth* v. *Waite*, 422 Mass. 792, 801-802 n.9 (1996).

[7]Harman's testimony did not place the victim with the defendant at the scene of the murder at the time it occurred, as the defendant argues. Rather, it was the defendant's own admission — never retracted — that he was with the victim that night and the Commonwealth's powerful evidence that he could only have been with her at that time and place, that established the link between a "Tony" mentioned by the victim and this defendant. Cf. *Commonwealth* v. *Gilday*, 382 Mass. 166, 178 (1980).

[8]The defendant admitted that his sexual encounter with the victim occurred at night. There is no evidence to support any inference that the encounter took place before the victim joined O'Regan.

next morning. Marie Kelly, a friend, testified that she picked up O'Regan and the victim at the Broadway subway station at 8 P.M. before returning with them to Kelly's apartment in South Boston for dinner. Ann Sullivan, another friend of the victim, testified that she met the victim at Kelly's apartment and that at 9 P.M. they all left for The Abbey, a local bar, where they met the rest of the group prior to the trolley tour. All three friends testified that the victim was with them continuously until approximately 1 A.M. The Commonwealth introduced a photograph of the victim taken on the trolley showing her watch reading 12:30 A.M.[9] The driver of the trolley testified that she dropped the victim off at around 1 A.M. on Brighton Avenue in Allston. Kelly and Sullivan each testified that they did not see the victim with the defendant that night.

While the defendant's claims regarding the timing and circumstances of his meeting with the victim are entirely inconsistent with powerful evidence to the contrary, overwhelming scientific evidence presented by the Commonwealth confirmed that the defendant did have sexual intercourse with the victim. DNA testing confirmed that semen samples taken from the victim and her clothing belonged to the defendant.[10] An expert also testified that the defendant's teeth caused a bite mark found on the victim's breast, and there was expert testimony that it was highly probable that the saliva found on the victim's breast came from the defendant.

The testimony of the victim's friends and the trolley driver, as well as the defendant's admission and the scientific evidence, compel a conclusion the sexual encounter must have occurred after 1 A.M. Other evidence shows that the defendant and the victim were in the same vicinity when the victim left the trolley. The point where the victim departed the trolley, the location of the victim's residence, the defendant's apartment building, and the West End House are all within close walking distance of one another.[11] The defendant was in his apartment until 12:30 A.M. His girl friend testified that at approximately 12:30 A.M.,

[9]On cross-examination, Marie Kelly admitted that the watch might have read 11:30 P.M.

[10]The Commonwealth's expert testified that the likelihood that the semen samples did not come from the defendant was one in 6.8 million.

[11]The defendant was familiar with the West End House and surrounding area. He worked for a city crew that cleaned the adjacent Ringer Park, and the crew stored its equipment in a closet or locker at the West End House. The

the defendant left the apartment to smoke a cigarette. No witness could account for his whereabouts between 12:30 A.M. and 7 A.M.[12]

During the course of the police investigation, the defendant's behavior exhibited consciousness of guilt. On the day of the murder, before he was contacted by the police, he attempted to secure a false alibi: he contacted a former girl friend and asked her to say, if asked, that on the night of the murder she had picked him up at 12:30 A.M. and he had stayed overnight at her apartment. As facts of the crimes came to light in response to the police investigation, the defendant repeatedly altered the stories he gave to police. On the first three occasions, he claimed that he spent the night of the murder at his former girl friend's apartment.[13] Between the third and fourth meeting with the police, his former girl friend recanted and told the police that the defendant was not at her apartment on that night, and that he had asked her to lie. During a fourth meeting, the police informed the defendant that they had a court order to obtain hair, saliva, and blood samples. At that point, the defendant abandoned his earlier alibis and admitted to having sexual intercourse with the victim on the night of the murder.

We are mindful of the potential impact on the jury of permitting the victim to speak through the words of her roommate. We are also mindful that "we should apply the principle of harmless error with restraint, particularly in the face of constitutional error." *Commonwealth* v. *Gilday*, 367 Mass. 474, 498 (1975). Nevertheless, in light of the overwhelming evidence of the defendant's guilt, including his own admission that he had a sexual encounter with the victim but in circumstances that could not have occurred, we conclude that in this case the judge's error in admitting the conversation between Harman and the victim "did not influence the jury, or had but very slight effect." *Commonwealth* v. *Gilday*, 382 Mass. 166, 178 (1980),

defendant's then girl friend worked at the West End House and had keys to which the defendant had access.

[12]The defendant claimed that after he left his apartment at 12:30 A.M. he went to a party down the street. He said he did not know anyone at the party. He said he left the party at approximately 4:30 A.M. and arrived back at his apartment at approximately 4:45 A.M., but did not want to wake anyone upon his return and therefore sat on the back stairs for a couple of hours.

[13]On each occasion, the defendant changed the timing and details of his travels from his apartment to his former girl friend's apartment in order to reconcile inconsistencies in each version.

quoting *United States* v. *Agurs*, 427 U.S. 97, 112 (1976). See *Commonwealth* v. *Marini*, 375 Mass. 510, 520 (1978).

3. The defendant next contends that the prosecutor made certain inappropriate statements during his closing argument. Specifically, the prosecutor referred to the victim's telephone call to Harman as a "call out for help," called the defendant a "monster" and threw a photograph and teeth impressions on the table in front of the defendant. These were wholly inappropriate and should not have occurred. The judge immediately and forcefully instructed the jury to "completely disregard" the references to the defendant as a "monster" and the "demonstration of throwing the photograph and the teeth impressions." The following day, during his instructions to the jury, the judge again stated clearly that statements made by the lawyers during the trial are not evidence.

When a defendant objects to the prosecutor's statements made during a closing argument, the standard for determining whether a conviction must be reversed because of inappropriate statements is whether the improper statements made by the prosecutor "constituted prejudicial error." *Commonwealth* v. *Daggett*, 416 Mass. 347, 352 n.5 (1993). "The cumulative effect of all the errors in the context of the entire argument and the case as a whole is considered in making this determination." *Commonwealth* v. *Santiago*, 425 Mass. 491, 500 (1997), *S.C.*, 427 Mass. 298 (1998). The following factors guide our determination:

> "whether defense counsel seasonably objected to the arguments at trial . . . whether the judge's instructions mitigated the error . . . whether the errors in the arguments went to the heart of the issues at trial or concerned collateral matters . . . whether the jury would be able to sort out the excessive claims made by the prosecutor . . . and whether the Commonwealth's case was so overwhelming that the errors did not prejudice the defendant" (citations omitted).

*Commonwealth* v. *Wilson*, 427 Mass. 336, 351 (1998), quoting *Commonwealth* v. *Santiago, supra* at 500.

We have examined the record as a whole and conclude that the prosecutor's closing argument, while unprofessional and

Commonwealth *v.* Rosario.

improper,[14] was not prejudicial to the defendant. The judge's prompt and forceful instructions would certainly have mitigated any error. The prosecutor did not attempt to mislead the jury regarding any factual issues in dispute, but rather used hyperbole to cast a negative light on the defendant. We have recognized, particularly in cases such as this, that "[t]he jury are presumed to have a certain measure of sophistication in sorting out excessive claims on both sides." *Commonwealth* v. *Wilson, supra* at 350. Recognizing that the Commonwealth's case was overwhelming, we conclude that these errors do not prejudice the defendant.

4. The defendant has made no argument that we should set aside or modify the verdict under our extraordinary power of review in a capital case, G. L. c. 278, § 33E. We have reviewed the entire record and perceive no reason to alter the verdict of the jury.

*Judgments affirmed.*

---

[14]Appellate counsel was not the prosecutor who delivered the closing argument.